IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 20-cv-1566-WJM-MEH

TRUEFORCE GLOBAL SERVICES, INC.,

    Plaintiff,

v.

TRUEFFECT, INC.,
DAVID HINTON,
CARLOS SALA, and
DOES 1–20,

    Defendants.

---

## ORDER DENYING DEFENDANT DAVID HINTON'S
## MOTION FOR SUMMARY JUDGMENT

---

    Plaintiff Trueforce Global Services, Inc. ("Trueforce") brings this breach of contract and false promise lawsuit against Defendants TruEffect, Inc. ("TruEffect") and two of its executives, David Hinton and Carlos Sala, and Does 1–20.  (ECF No. 84.)

    This matter is before the Court on Hinton's Motion for Summary Judgment ("Motion"), filed on September 1, 2021.  (ECF No. 77.)  For the reasons explained below, the Motion is denied.

## I. BACKGROUND[1]

### A. Factual Background[2]

Trueforce is an information technology services and software consulting company. (ECF No. 77 at 5 ¶ 2.) TruEffect was a data and analytics company that provided media and marketing services. (*Id.* ¶ 1.) Hinton joined TruEffect's Board of Directors in 2015 and became its CEO in March 2017. (ECF No. 78 at 2 ¶ 4; ECF No. 77 at 7 ¶ 18.)

In 2013, TruEffect partnered with Trueforce to develop a software product suite to support TruEffect's capabilities. (ECF No. 77 at 5 ¶ 3.) Under the terms of the parties' May 31, 2013 Agreement for Consultants, Trueforce performed services for TruEffect, and TruEffect agreed to pay Trueforce within 15 days after invoicing, resulting in two payments per month from TruEffect to Trueforce. (*Id.* ¶¶ 4–6.)

While TruEffect's unpaid balances ebbed and flowed over time, TruEffect owed Trueforce $183,528, with $160,776 past due, by December 2016. (*Id.* ¶¶ 7–10; ECF No. 78 at 2 ¶¶ 7–10.) When Trueforce's CEO, Gus Laredo, expressed concern over the

---

[1] The following factual summary is based on the parties' briefs and the documents submitted in support thereof. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Moreover, the parties have collectively provided 199 statements of material fact, which are heavily disputed. (ECF No. 77 at 5–25; ECF No. 78 at 1–37.) The Court only lists those material facts which are pivotal to resolving the Motion.

[2] The parties frequently cite exhibits by the name of the exhibit (*i.e.*, "Hinton Depo.") rather than the exhibit number and CM/ECF docket entry. As a result, the Court was required to search through numerous exhibits to find any given exhibit referenced by the parties. Such a task is a tremendous waste of judicial resources. *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). In the future, the parties are directed to include in all briefs proper citations to the exhibit number and the associated docket entry number and page number from the CM/ECF headers.

fact that the account is "very much in the red" in January 2017, TruEffect engineer, Dave Witonsky, informed Laredo that TruEffect had recently lost the media budget from a client, which has impacted its financial situation. (ECF No. 77 at 6 ¶¶ 11–13.) Thereafter, following an early February 2017 call between Laredo, Witonsky, and TruEffect's Chief Financial Officer, Tony DiPaolo, TruEffect agreed to send three payments per calendar month to catch up on the outstanding debt. (*Id.* ¶ 16.) Nonetheless, TruEffect only made one payment in March 2017. (*Id.* at 7 ¶ 17.)

After Hinton became CEO in March 2017, he continued TruEffect's efforts to raise additional funds for TruEffect. (*Id.* ¶¶ 18, 21.) Laredo testified that he was aware that TruEffect was raising money at various times; likewise, DiPaolo testified that he told Laredo that TruEffect "expected to raise funds" to shore up the company's financial position so that it could bring Trueforce's account to a more reasonable position. (*Id.* ¶¶ 22–23, 26, 31; ECF No. 78 at 3–4 ¶¶ 22–23.) However, by August 29, 2017, TruEffect owed Trueforce $236,724 with $208,532 overdue, and Laredo admitted that he was concerned throughout 2017 about the growing balance and whether Trueforce would be paid. (ECF No. 77 at 8 ¶¶ 28, 30.)

Hinton first met and spoke with Laredo at a meeting on October 17, 2017, at which time TruEffect owed Trueforce around $320,000. (ECF No. 77 at 10 ¶¶ 39, 41.) Hinton told Laredo "something along the lines of we're working on [getting caught up]," and he subsequently offered Trueforce the opportunity to participate "in TruEffect's fundraising by rolling some of [*sic*] all of [the outstanding] invoices into an investment in TruEffect." (*Id.* at ¶¶ 42, 47–48.) As part of this offer, Trueforce would receive

3

TruEffect's financial and operational information if they were interested in participating in TruEffect's fundraising efforts.  (ECF No. 77 at 12 ¶¶ 55–57.)

Hinton has signed a sworn affidavit stating that that he told Laredo "half a dozen times that TruEffect would need to raise more money in order for TruEffect to pay Trueforce" and asserts that he never told Laredo that TruEffect would pay Trueforce "in full."  (ECF No. 77-13 at 4 ¶ 13.)  Laredo disputes these statements; he testified during his deposition that he did not recall being informed that TruEffect needed to close additional fundraising to make additional payments; instead, he stated that Hinton promised that TruEffect would pay Trueforce in full and would "catch up on what's due in the past."  (ECF No. 78-4 at 20, 66, 70–71.)

In November 2017, Laredo, on behalf of Trueforce, declined the investment offer in TruEffect and instead tendered a statement showing an outstanding balance of $347,972.  (ECF No. 77 at 12 ¶¶ 59–60.)  Although TruEffect at times paid down some of the outstanding balance it owed to Trueforce, it still delayed making additional payments due in late 2017.  (*Id.* at 13 ¶¶ 62, 65.)

In January 2018, TruEffect learned that it had lost its largest customer, Metro PCS/T-Mobile.  (*Id.* at 14 ¶ 70.)  Hinton and DiPaolo informed Laredo that TruEffect had lost this customer and would need to conduct some layoffs.  (*Id.* ¶ 72; ECF No. 78 at 14 ¶ 73.)  The parties dispute whether Hinton told Laredo that this was TruEffect's largest customer, that the loss of this revenue would affect TruEffect's ability to cover expenses, that TruEffect's payments to Trueforce were dependent on further financing, and that "if Trueforce wanted to continue to support TruEffect, Trueforce would need to, at a minimum, reduce the number of Trueforce employees working for TruEffect to

4

lower TruEffect's monthly bills and accept payments only on an ongoing basis, which TruEffect would make to the best of its ability." (*Compare* ECF No. 77-13 at 4–5 ¶¶ 24–25 *with* ECF No. 78-5 at 4 ¶ 8.) Laredo further testified that he received additional assurances from Hinton that TruEffect would pay Trueforce. (*See* ECF No. 78-4 at 69 ("Q. So in every conversation that you had with Mr. Hinton starting in January 2018, Mr. Hinton told you we're going to pay you. A. In some – in so many words, yes.").)

On May 3, 2018, Hinton and Laredo met again to discuss Trueforce's outstanding invoices, and Hinton agreed that TruEffect would put together a potential payment schedule. (ECF No. 77 at 15 ¶¶ 79–83.) Hinton worked with DiPaolo to put together a payment schedule that contemplated payments totaling approximately $132,000, which was ultimately sent to Laredo on May 21, 2018.[3] (*Id.* at 16–17 ¶¶ 86, 90, 92.) Laredo testified that this payment schedule concerned only future work and that Hinton still promised that TruEffect was going to catch up on its outstanding invoices by continuing to pay three payments per month. (ECF No. 78-4 at 62–64.) At this time, TruEffect owed Trueforce over $400,000. (ECF No. 77 at 17 ¶ 93.)

Despite the parties' agreement, TruEffect missed the very first payment on June 19, 2018, and TruEffect's outstanding balance continued to grow, reaching $456,640 by October 2018. (*Id.* at 18 ¶¶ 100, 104–05.)

During a November 14, 2018 phone call between Laredo, Hinton, and DiPaolo, Hinton told Laredo about TruEffect's potential sale, divestment, or strategic deal with

---

[3] The parties dispute whether DiPaolo was still employed as TruEffect's CFO at this time. DiPaolo asserts in an affidavit that he had resigned as CFO on February 7, 2018 and thereafter served as a contractor to TruEffect until at least June 2019. (ECF No. 77-11 at 5, 9 ¶¶ 14, 24.) Hinton disputes this point, stating that DiPaolo continued his role as TruEffect's CFO until the company suspended its operations in January 2019. (ECF No. 81 at 9 ¶ 172.)

another company, and Laredo informed Hinton that Trueforce would stop providing services unless TruEffect started making payments to reduce the balance owed. (*Id.* ¶¶ 111–13.)

On December 14, 2018, Trueforce provided its 60-day notice that it was cancelling the Agreement for Consultants. (*Id.* at 20 ¶ 118.) Trueforce thereafter ceased its operations in January 2019. (*Id.* ¶ 119.) In an e-mail dated January 31, 2019, Hinton informed Laredo that TruEffect had "ceased all business operations," was "unable to repay any amount to its creditor[s]," and was shutting down its business without plans to go through dissolution or bankruptcy proceedings. (ECF No. 77-40.)

Furthermore, as part of this litigation, DiPaolo submitted a declaration stating, *inter alia*, that:

- In the second half of 2017, Sala and Hinton had determined that their equity investment in TruEffect was worthless (ECF No. 77-11 at 6 ¶ 15);

- Starting in January or February 2018, DiPaolo began explaining to TruEffect's creditors that TruEffect was insolvent and was unable to pay its bills; in response, those creditors that were still willing to provide goods and services to TruEffect generally imposed restrictive payment terms, such as requiring TruEffect to pay in full as a condition precedent to the delivery of any items of value to TruEffect. However, because Hinton had assigned himself as the person responsible for direct communications with Trueforce starting in or about October 2017, DiPaolo did not explain this to Trueforce as he "understood based on that assignment, which was the only such assignment of a TruEffect creditor relationship to [Hinton], that [he] was not to communicate the same information [he] had shared with TruEffect's other creditors (that TruEffect was insolvent, had significant judgments against it and was unable to pay creditors, that it had a massive negative working position, that its largest lender had cut it off, and that

6

- it didn't have any significant assets it could sell) with Trueforce" (*id.* at 7 ¶ 17);

- From approximately early 2018 forward, he presented Hinton with weekly cash budgets that they went over in detail and that, as part of that review, "Hinton would review the cash budgets and evaluate whether the balance due and owing to Trueforce was growing or shrinking, and would comment to [him] at times on the results of his analysis and whether he believed Trueforce or [Laredo] could complain based thereon" (*id.* at 8 ¶ 20);

- By February 2018, he understood (and had explained to Hinton and Sala) that TruEffect was "within the zone of insolvency" and that it "did not have a workable plan in effect for dealing with TruEffect's situation" (*id.* at 6 ¶ 14);

- By May 2018, TruEffect began consulting with bankruptcy counsel (*id.* at 8 ¶ 18);

- In May 2018, he sent e-mails to Hinton that included "financial information and projections for TruEffect which showed, among other things, TruEffect running out of cash in July of 2018, and the efforts on the part of TruEffect to hide assets from creditors and avoid levy/attachment, etc. of those assets" (*id.* ¶ 19);

- Despite receiving TruEffect's weekly cash budgets, Hinton confirmed to him that "he had promised to make certain payments to Trueforce, including those set forth in the attachment to [Hinton's May 21, 2018 e-mail to Laredo] . . . Based on the information [he] had provided to [Hinton], [DiPaolo] had and ha[s] no idea how he could have truly intended for those payments to be made to Trueforce, or [had] any reasonable belief or basis for any belief that TruEffect had or would have the ability to make the promised payments" (*id.* at ¶ 21).

B.   **Procedural History**

Trueforce filed this action in Contra Costa County Superior Court in California on November 14, 2019, and TruEffect and Hinton removed this action to the Northern

7

District of California on January 2, 2020.  (ECF No. 1.)

On January 10, 2020, Trueforce filed its first amended complaint, which alleged claims of breach of contract, breach of implied contract, and false promise against TruEffect and Hinton.  (ECF No. 7.)  Hinton and TruEffect moved to dismiss the first amended complaint on February 10, 2020.  (ECF No. 15.)  On June 1, 2020, United States District Judge Saundra Brown Armstrong granted Hinton and TruEffect's motion to dismiss as to Hinton; she dismissed the breach of contract and breach of implied contract claims against Hinton with prejudice and dismissed the false promise claim against Hinton without prejudice for Trueforce's failure to state a claim.  (ECF No. 25 at 14.)  Judge Armstrong also granted TruEffect and Hinton's motion to transfer venue and transferred the action to the District of Colorado.[4]  (*Id.*)

On June 26, 2020, Trueforce filed the second amended complaint, which alleged claims of breach of contract and breach of implied contract against TruEffect and Does 1–20, as well as a false promise claim against TruEffect, Hinton, and Does 1–20.  (ECF No. 38.)  Hinton moved to dismiss the second amended complaint on July 13, 2020 (ECF No. 46), which the Court denied on January 29, 2021 (ECF No. 53).

On September 1, 2021, Hinton filed the Motion.  (ECF No. 77.)  Trueforce responded on September 22, 2021 (ECF No. 78), and Hinton replied on October 6, 2021 (ECF No. 81).

On November 4, 2021, the Court granted Trueforce's Motion to Modify Scheduling Order and granted Trueforce leave to file Third Amended Complaint.  (ECF No. 83.)  On the same day, Trueforce filed the Third Amended Complaint, alleging the

---

[4] The action was assigned to the undersigned on June 1, 2020.  (ECF No. 28.)

8

following claims: (1) breach of contract against TruEffect and Does 1–20; (2) breach of implied contract against TruEffect and Does 1–20; and (3) false promise against TruEffect, Hinton, Carlos Sala, and Does 1–20.  (ECF No. 84.)  Sala, Hinton, and TruEffect filed their respective Answers to the Third Amended Complaint on November 15, 2021.  (ECF Nos. 85–87.)

Notably, neither Trueforce nor Hinton has raised any argument regarding whether the Court should apply the Motion to the Third Amended Complaint; nor did Hinton move to withdraw the Motion after the Third Amended Complaint was filed.  Although the undersigned could deem the Motion to be moot since it is directed to a complaint that is no longer operative, in the interests of justice the Court will deem the Motion as applying to the Third Amended Complaint.[5]

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and

---

[5] Because the Court is treating the Motion as applying to the Third Amended Complaint, Hinton will not be permitted to file an additional motion for summary judgment at the close of fact discovery.

9

all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### III. ANALYSIS

To maintain a claim of fraud, a plaintiff must establish that: (1) the defendant made a false representation of a material fact; (2) the defendant knew the representation was false; (3) "the person to whom the representation was made was ignorant of the falsity"; (4) "the representation was made with the intention that it be acted upon"; and (5) "the reliance resulted in damage to the plaintiff."  *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).  Hinton argues that Trueforce cannot prove the first, second, third, and fifth elements of the claim.  (ECF No. 77 at 27.)

**A.   Whether Hinton Made a False Statement of Material Fact**

"[A] false representation of a past or present fact is any words or conduct which create[s] an untrue or misleading impression of the actual past or present fact in the mind of another."  *Nelson v. Gas Research Inst.*, 121 P.3d 340, 343 (Colo. App. 2005) (quoting *Russell v. First Am. Mortgage Co.,* 39 Colo. App. 360, 364 (1977)).  "A fact is material if a reasonable person under the circumstances would attach importance to it in determining his or her course of action."  *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018).

Hinton argues that Trueforce has failed to introduce evidence demonstrating that

10

he promised that TruEffect would pay Trueforce "in full" and that none of Trueforce's allegations "regarding Hinton's promises are supported by the evidence, either in writing or from anyone's testimony." (ECF No. 77 at 28–29.) According to Hinton, "Laredo's vague, self-serving testimony that he thinks Hinton told him 'somewhere in our relationship between 2017 mid to November 14[, 2018]' that Trueforce would be paid 'in full'" is too vague to establish evidence of a false representation to and that Trueforce provides only conclusory allegations of fraud. (*Id.* at 30.) Hinton also argues that Trueforce's contentions about Hinton's alleged promises defy common sense as Hinton took over as TruEffect's CEO after the company had already amassed a substantial debt to Trueforce and "it makes no sense that Hinton would promise Trueforce payment 'in full' with money TruEffect did not have." (*Id.* at 30–31.)

Trueforce responds that although Hinton "attempts to create in his motion a requirement that the verbatim phrase 'in full' be used in the discussions that occurred concerning his promises to pay Trueforce[,] . . . there is no such requirement under the law." (ECF No. 78 at 38.) He argues that the evidence demonstrates that after Sala promised that Trueforce would be paid "every penny," Hinton made "repeated promises that Trueforce would be paid on both its past and future invoices." (*Id.*) The Court agrees.

The Court finds there are substantial disputed facts regarding whether Hinton made material and false representations to Trueforce regarding TruEffect's payments. For example, DiPaolo stated in his declaration that although he had explained to Hinton that TruEffect was at serious risk of failing financially, "Hinton confirmed to [DiPaolo] that he had promised to make certain payments to Trueforce, including those set forth in

11

the attachment to [Hinton's] May 21, 2018 e-mail to [Laredo] . . . ."  (ECF No. 77-1 at 6, 8 ¶¶ 14, 21.)  Likewise, Laredo testified that Hinton still represented to him on May 21, 2018 that TruEffect would catch up on its past invoices by making three payments per month.  (ECF No. 78-4 at 62–64; *see also* ECF No. 78-4 at 69 ("Q. So in every conversation that you had with Mr. Hinton starting in January 2018, Mr. Hinton told you we're going to pay you."  LAREDO: "In some – in so many words, yes.").)  If credited by the trier of fact, these statements are sufficiently specific and are more than conclusory allegations of false representations.[6]

Likewise, although Hinton signed a sworn affidavit stating that that he told Laredo "half a dozen times that TruEffect would need to raise more money in order for TruEffect to pay Trueforce" and asserts that he never told Laredo that TruEffect would pay Trueforce in full" (ECF No. 77-13 at 4 ¶¶ 13–14), Laredo disputes Hinton's version of events.  Laredo stated during his deposition that he did not recall being informed that TruEffect needed to close additional fundraising to make additional payments and that Hinton promised that TruEffect would pay Trueforce in full and "would catch up on what's due in the past."  (ECF No. 78-4 at 20, 66, 70–71.)

Moreover, the Court is unpersuaded by Hinton's arguments that Trueforce is impermissibly attempting to amend its pleadings to avoid summary judgment.  (ECF No. 81 at 14.)  Hinton's alleged specific verbiage does not change the fundamental nature of Trueforce's false promises claim, *i.e.*, that Hinton falsely informed Trueforce that

---

[6] The Court notes that Trueforce's false promise claim against Hinton may well turn on witness credibility.  However, "[o]n summary judgment, a district court may not weigh the credibility of the witnesses."  *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008); *Eagle v. La. & S. Life Ins. Co.*, 464 F.2d 607, 608 (10th Cir. 1972) ("Summary judgment is not proper when an issue turns on credibility.").

12

TruEffect would pay Trueforce for all of the outstanding invoices.

**B.      Whether Hinton Knew His Statements Were False**

The alleged falsity of a defendant's statements turns on the defendant's intent at the time the statements were made.  *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1116 (D. Colo. 2010), *aff'd,* 566 F. App'x 681 (10th Cir. 2014).  Fraud requires more than the mere nonperformance of a promise or the failure to fulfill an agreement to do something at a future time.  *Nelson*, 121 P.3d at 343 (citing *State Bank of Wiley v. States*, 723 P.2d 159, 160 (Colo. App. 1986)).  "Unless the speaker making the representations deliberately falsified his or her intention to induce reliance, statements of future events are not actionable."  *Id.*  However, "[a] promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud."  *Kinsey v. Preeson*, 746 P.2d 542, 551 (Colo. 1987) (en banc).

Hinton argues that the only evidence of a proposal regarding payment that he presented on behalf of TruEffect to Trueforce is the potential schedule of payments that Hinton sent to Laredo in advance of their May 21, 2018 phone call.  (ECF No. 77 at 32.) He argues that this schedule does not address past due invoices, but rather payments TruEffect reasonably believed the company could make going forward; moreover, Hinton argues that evidence of his intent to defraud is belied by the fact that he sent the schedule to DiPaolo asking for his input before the call with Laredo.  (*Id.* at 32–33.) According to Hinton, "[b]ecause Trueforce cannot prove Hinton offered the proposed payment schedule knowing TruEffect had no intent to perform, its false promises claim cannot survive summary judgment and should be dismissed."  (*Id.* at 34.)

13

Hinton further argues, *inter alia*, that the evidence shows: that he kept Laredo informed about TruEffect's finances and ongoing fundraising efforts; that he "offered Laredo full visibility into TruEffect's finances in an effort to give Trueforce an opportunity to convert its unsecured invoices into a secured investment in TruEffect"; and that he told Laredo "almost immediately" when TruEffect's business suffered the loss of a significant client.  (*Id.* at 33.)

Trueforce responds by pointing to DiPaolo's declaration, as well as Hinton's own admission that he never told Trueforce that it would not be paid *at all* unless TruEffect was successful in raising new funds.  (ECF No. 78 at 39.)

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the Court concludes there is evidence from which a reasonable factfinder could conclude that Hinton acted with an intent to defraud Trueforce by making promises concerning future actions while maintaining a present intention not to fulfill those promises.  *Kinsey*, 746 P.2d at 551.

For example, DiPaolo asserts that beginning in early 2018, he began giving explanations to TruEffect's other creditors that TruEffect was insolvent and was unable to pay its bills; however, because Hinton had assigned himself as the sole person responsible for direct communications with Trueforce, DiPaolo "understood . . . that [he] was not to communicate the same information [he] had shared with TruEffect's other creditors (that TruEffect was insolvent, had significant judgments against it and was unable to pay creditors, that it had a massive negative working position, that its largest lender had cut it off, and that it didn't have any significant assets it could sell) with Trueforce."  (ECF No. 77-11 at 7 ¶ 17.)  Moreover, DiPaolo asserts that although he

14

sent Hinton financial information and projections that showed TruEffect running out of cash in July 2018 (*id.* at 8 ¶ 19), Hinton told him that "he had promised to make certain payments to Trueforce, including those set forth in the attachment to [the May 21, 2018 e-mail to Laredo" and that DiPaolo "had and has no idea how [Hinton] could have truly intended for those payments to be made to Trueforce, or have had any reasonable belief or basis for any belief that TruEffect had or would have the ability to make the promised payments" (*id.* ¶¶ 20–21).

Accordingly, the Court finds that there are genuine issues of material fact regarding whether Hinton knew his statements regarding TruEffect's payment to Trueforce were false when they were made and nonetheless acted with an intent to defraud.

C.   **Whether Trueforce Was Ignorant of the Falsity of Hinton's Statements & Whether Its Reliance Resulted in Damage**

"To make out a claim for fraud in Colorado, a party must establish actual and reasonable reliance on a false statement; a party cannot—as a matter of law—continue to rely on a previous expressed false statement after the truth is aired." *Espinoza v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1158 (10th Cir. 2016); *see also Rocky Mountain Expl., Inc.*, 420 P.3d at 234 ("A party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation."); *see Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2013) (en banc) (recognizing that "if a party claiming fraud has access to information that was equally available to both parties and would have led to the true facts, that party has no right to rely on a false representation").

Hinton argues that "the undisputed material facts show that Trueforce could not

15

possibly have been ignorant of the falsity of any alleged representation that Trueforce would be paid 'in full' or reasonably relied on such a representation." (ECF No. 77 at 34.)  He argues that Trueforce made the decision to continue providing services to TruEffect despite evidence of its mounting debt.  (*Id.* at 35 (arguing that after May 2018, "Trueforce decided to continue to provide services even though the potential payment schedule TruEffect sent addressed future work only, did not address past-due invoices, and did not guarantee payment 'in full.'").)  He also argues that "evidence shows Trueforce at all relevant times understood that TruEffect needed to raise funds in order to pay its invoices"; that Laredo was repeatedly informed of TruEffect's financial troubles; and that Trueforce refused TruEffect's offer for Laredo to review the company's financial statements.  (*Id.* at 36.)  Thus, Hinton argues that because "Trueforce at all times knew enough about TruEffect's financial position to make an informed decision about whether to terminate the Agreement or continue to perform," the false promise claim fails as a matter of law.  (*Id.* at 37.)

In response, Trueforce argues that there is significant evidence that it was ignorant of the falsity of Hinton's promises to pay in full and that Trueforce justifiably relied on those promises.  (ECF No. 78 at 39.)  Among other things, Trueforce points to the fact that TruEffect had historically run significant balances with Trueforce but nonetheless previously made significant payments to bring its balance down, as well as the fact that "neither Hinton nor TruEffect told [Laredo] that Trueforce would not be paid at all if TruEffect wasn't able to fundraise successfully."  (*Id.*)

The Court agrees with Trueforce that there are genuine issue of material fact regarding Trueforce's awareness of the falsity of Hinton's purported statements and

whether its reliance was justifiable.  For example, the parties dispute whether Hinton ever told Trueforce that it would not be paid at all if TruEffect did not successfully raise additional funds.  (*Compare* ECF No. 77-13 at 4 ¶¶ 13–14 *with* ECF No. 78-4 at 20, 66, 70–71.)  Moreover, the Court concludes that a reasonable fact finder could conclude that Trueforce was ignorant of the falsity of Hinton's purported false promises based on TruEffect's prior history of payments which brought down its outstanding balance.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that Defendant David Hinton's Motion for Summary Judgment (ECF No. 77) is DENIED.

Dated this 19th day of April, 2022.

BY THE COURT:

_____
William J. Martínez
United States District Judge